UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KYLE B. RICHARDS #641715, et al.,              Case No. 2:20-cv-76

             Plaintiffs,                     Hon. Hala Y. Jarbou
                                             U.S. District Judge

    v.

UNKNOWN PERTTU,

             Defendant.
_____/

## **REPORT AND RECOMMENDATION**

### I.    Introduction

State prisoners Kyle B. Richards, Kenneth Damon Pruitt, and Robert Kissee filed this civil rights action pursuant to 42 U.S.C. § 1983 on April 23, 2020. Plaintiffs allege that while they were incarcerated at Baraga Correctional Facility (AMF) in Baraga, Michigan, Defendant Resident Unit Manager (RUM) Thomas Perttu (1) sexually harassed them, (2) retaliated against them, and (3) destroyed their property in violation of their First, Fifth, and Eighth Amendment rights. In total, they allege some 45 violations of their rights from June 2019 through mid-April 2020.

On September 25, 2020, RUM Perttu filed a motion for summary judgment based on Plaintiffs' failure to exhaust their administrative remedies. (ECF No. 34.) Perttu asserted that Plaintiffs failed to exhaust their administrative remedies with respect to any of their claims. (ECF No. 35, PageID.122-123.) On August 10, 2021, this Court denied Perttu's motion for summary judgment. (ECF No. 105.) Perttu then requested a bench trial on the issue of exhaustion, which the undersigned

granted.

The undersigned conducted a bench trial on the issue of exhaustion on November 4, 2021. The only issue before the Court in this hearing was whether Plaintiffs exhausted their administrative remedies as to each of their claims. Plaintiffs assert the following claims against RUM Perttu.[1],[2]

| Claim Number | Plaintiff | Claim | Date or Date Range of Incident(s) | Factual Allegation |
|---|---|---|---|---|
| 1 | Richards | 8th Amendment | 06/20/2019 | RUM Perttu propositioned Richards, Richards declined, and Perttu threatened to kill him if he told anyone about the encounter. (ECF No. 1, PageID.5.) |
| 2 | Richards | 8th Amendment | 08/19/2019 | RUM Perrtu threatened to send Richards to segregation if he did not engage in sex work and offered to help him escape from prison if he did. (*Id.*) |
| 3 | Richards | 8th Amendment | 08/20/2019 | RUM Perttu threatened Richards in an attempt to get him to engage in sex work. (*Id.*, PageID.6.) |
| 4 | Richards | 8th Amendment | 01/07/2020 | RUM Perrtu told Richards to engage in sex work for him. When Richards said no, RUM Perrtu threatened to kill him. (*Id.*) |
| 5 | Richards | 8th Amendment | 01/15/2020 | RUM Perttu told Richards that if he wanted out of segregation, he would have to engage in sex work. (*Id.*) |
| 6 | Richards | 8th Amendment | 01/22/2020 | RUM Perttu told Richards that he could keep him in segregation forever unless Richards did what he wanted. (*Id.*, PageID.7.) |
| 7 | Richards | 8th Amendment | 01/29/2020 | RUM Perttu propositioned Richards. (*Id.*) |

---

[1]    Although all Plaintiffs signed the verified complaint, it is worth noting that all but three pages of the fifty-two-paged complaint were written by Richards.

[2]    During the bench trial, Perttu stated his belief that the only Plaintiffs' Eighth Amendment claims based on sexual harassment remained. Although the Court did not include a discussion of additional claims in its July 29, 2021 Report and Recommendation (R&R) (ECF No. 97), the Court also did not dismiss these claims. Generally, the use of a claims table in an R&R expressly sets forth the claims as the Court understands them and controls the case going forward in the absence of objections. However, no such table has been utilized by the Court nor offered by the parties in this case until now. Thus, up until the issuance of this R&R, all of Plaintiffs' claims remained in the case.

| Claim Number | Plaintiff | Claim | Date or Date Range of Incident(s) | Factual Allegation |
|---|---|---|---|---|
| 8 | Richards | 8th Amendment | 02/04/2020 | RUM Perttu propositioned Richards.  When Richards asked Perttu to stop harassing him, Perttu threatened to kill him.  (*Id.*) |
| 9 | Richards | 8th Amendment | 02/12/2020 | RUM Perttu told Richards he was going to get him to comply with his demands one way or another.  (*Id.*, PageID.8.) |
| 10 | Richards | 8th Amendment | 02/18/2020 | RUM Perttu told Richards he could engage in sex work or remain in segregation.  (*Id.*) |
| 11 | Richards | 8th Amendment | 02/26/2020 | RUM Perttu told Richards to masturbate in front of him.  (*Id.*) |
| 12 | Richards | 8th Amendment | 03/04/2020 | RUM Perttu asked whether Richards was "ready to play ball."  (*Id.*) |
| 13 | Richards | 8th Amendment | 03/10/2020 | RUM Perttu asked if Richards was masturbating, and, upon learning that Richards was urinating, refused to walk away.  (*Id.*, PageID.9.) |
| 14 | Richards | 8th Amendment | 03/18/2020 | RUM Perttu propositioned Richards.  (*Id.*) |
| 15 | Richards | 8th Amendment | 03/26/2020 | Knowing that Richards had a hearing coming up, RUM Perttu told Richards to engage in sex work if he wanted parole.  (*Id.*, PageID.10.) |
| 16 | Richards | 8th Amendment | 04/01/2020 | RUM Perttu told Richards it was only a matter of time before he gave in to Perttu's demands.  (*Id.*) |
| 17 | Richards | 8th Amendment | 04/13/2020 | RUM Perttu told Richards that if he did not engage in sex work, Perttu would find a way to place him in segregation again.  (*Id.*) |
| 18 | Richards | 8th Amendment | 04/14/2020 | While Richards showered, RUM Perttu looked at his genital area and threatened to come into the shower.  (*Id.*) |
| 19 | Pruitt | 8th Amendment | 03/27/2020 | RUM Perttu told Pruitt that policy required him to come out of the shower "half nude," and that he liked seeing Pruitt's "lovely arms and chest."  (*Id.*, PageID.12.) |
| 20 | Pruitt | 8th Amendment | 04/01/2020 | Pruitt went up to his cell door and asked RUM Perttu when he was running SCC[3] again.  RUM Perttu told Pruitt to stop showing his genitals to female officers if he wanted to know.  (*Id.*) |
| 21 | Pruitt | 8th Amendment | 04/08/2020 | RUM Perttu asked Pruitt if he was done showing his body to Perttu's female officers.  When Pruitt told Perttu he wasn't going to play his game, Perttu threatened to keep Pruitt in segregation for as long as possible. (*Id.*, PageID.13.) |

[3]    SCC stands for Security Classification Committee.  (ECF No. 153, PageID.737 (Def.'s Exh. C1).)  The SCC determines whether a prisoner is ready to be moved out of administrative segregation.  (*Id.*)

| Claim Number | Plaintiff | Claim | Date or Date Range of Incident(s) | Factual Allegation |
|---|---|---|---|---|
| 22 | Pruitt | 8th Amendment | 04/14/2020 | During Pruitt's morning shower RUM Perttu said he would let Pruitt out of segregation if Pruitt engaged in sex work. (*Id.*, PageID.13-14.) |
| 23 | Kissee | 8th Amendment | 01/23/2020 | RUM Perttu told Kissee he would never get out of segregation if he kept having sexual relations with Black inmates. (*Id.*, PageID.15.) |
| 24 | Kissee | 8th Amendment | 02/13/2020 | RUM Perttu asked Kissee whether he was ready to leave Black men alone and directed him to masturbate. (*Id.*) |
| 25 | Kissee | 8th Amendment | 02/20/2020 | Kissee asked RUM Perttu why he was harassing him so much. RUM Perttu told Kissee the harassment was racially motivated and told Kissee to engage in sex work for him. (*Id.*) |
| 26 | Kissee | 8th Amendment | 03/09/2020 | RUM Perttu told Kissee that "white people run the world" and threatened to have Kissee killed unless he masturbated. (*Id.*, PageID.16.) |
| 27 | Kissee | 8th Amendment | 04/09/2020 | RUM Perttu told Kissee to engage in sex work if he wanted to get out of segregation. (*Id.*, PageID.16-17.) |
| 28 | Richards | 1st Amendment Retaliation | 08/20/2019 | RUM Perttu told Richards that, because Richards was not doing what he wanted, he would transfer Richards to a level four prison, where Richards would be more susceptible to violence. (*Id.*, PageID.28.) When Richards refused to be transferred, he was sent to administrative segregation and Perttu directed staff to write false misconduct reports against him. Perttu coordinated this transfer because of Richards attempts to file grievances. (*Id.*, PageID.25.) |
| 29 | Richards | 8th Amendment | 08/20/2019- | RUM Perttu coordinated Richards's transfer to administrative segregation despite the fact Richards suffers from various mental illnesses. (*Id.*, PageID.31.) |
| 30 | Richards | Americans with Disabilities Act | 08/20/2019- | RUM Perttu coordinated Richards's transfer to administrative segregation despite the fact Richards suffers from various mental illnesses. (*Id.*) |
| 31 | Pruitt | 8th Amendment | 08/2019-01/05/2020 | RUM Perttu arranged for several inmates to attack Pruitt. When Pruitt took actions to defend himself, he was put into administrative segregation by RUM Perttu, and given a misconduct. (*Id.*, PageID.29.) |
| 32 | Pruitt | 1st Amendment Retaliation | 08/2019-01/05/2020 | RUM Perttu coordinated the attack on Pruitt and Pruitt's subsequent transfer because of Pruitt's attempts to file grievances. (*Id.*, PageID.25.) |
| 33 | Kissee | 8th Amendment | 06/06/2019 | RUM Perttu sent a white nationalist inmate to attack Kissee. Kissee was forced to defend himself. Kissee was then found guilty of fighting/assault and was held in segregation for ten months. (*Id.*, PageID.30.) |

4

| Claim Number | Plaintiff | Claim | Date or Date Range of Incident(s) | Factual Allegation |
|---|---|---|---|---|
| 34 | Kissee | 1st Amendment Retaliation | 06/06/2019 | Perttu coordinated the attack on Kissee and Kissee's subsequent transfer because of Kissee's attempts to file grievances. (*Id.*, PageID.25.) |
| 35 | Richards, Pruitt, Kissee | 1st Amendment Retaliation | 03/20/2020 | RUM Perttu denied Plaintiffs' access to their JPay accounts, JP5 players, and to the media store in retaliation for Plaintiffs filing grievances against him. (*Id.*, PageID.32.) |
| 36 | Richards, Kissee | 1st Amendment Retaliation | 01/01/2020 | Richards and Kissee asked RUM Perttu for legal supplies.  Based on the grievances and complaints they had previously filed, RUM Perttu denied their requests. (*Id.*, PageID.34-36.) |
| 37 | Richards, Pruitt | 1st Amendment Retaliation | 02/14/2020 | Richards and Pruitt asked RUM Perttu for legal supplies.  Based on the grievances and complaints they had previously filed, RUM Perttu denied their requests. (*Id.*) |
| 38 | Richards, Pruitt, Kissee | 1st Amendment Retaliation | 04/09/2020-04/11/2020 | Plaintiffs asked RUM Perttu for legal supplies. Based on the grievances and complaints they had previously filed, RUM Perttu denied their requests. (*Id.*) |
| 39 | Richards | 5th Amendment | 04/04/2020 | RUM Perttu entered the AMF property room and slammed Richards's KTV Television and his JP5 media player against the wall. (*Id.*, PageID.37.) |
| 40 | Richards | 1st Amendment Retaliation | 04/04/2020 | RUM Perttu destroyed Richards's television and media player because of Richards's attempts to file grievances. (*Id.*) |
| 41 | Pruitt | 5th Amendment | 04/15/2020 | Richards observed RUM Perttu enter Pruitt's cell and throw numerous folders of legal documents into the toilet bowl. (*Id.*, PageID.38.) |
| 42 | Pruitt | 1st Amendment Retaliation | 04/15/2020 | RUM Perttu destroyed Pruitt's legal property because of Pruitt's attempts to file grievances. (*Id.*, PageID.37.) |
| 43 | Kissee | 5th Amendment | 04/16/2020 | Richards observed RUM Perttu enter plaintiff Kissee's cell and begin tearing up legal documents. (*Id.*, PageID.38.) |
| 44 | Kissee | 1st Amendment Retaliation | 04/16/2020 | RUM Perttu destroyed Kissee's legal property because of Kissee's attempts to file grievances. (*Id.*, PageID.37.) |
| 45 | Richards, Pruitt, Kissee | 8th Amendment | 04/21/2020 | RUM Perttu shut off the water in Plaintiffs' cells and told Plaintiffs they would die of thirst before drinking his water. (*Id.*, PageID.39.) |

During the bench trial, RUM Perttu presented evidence that grievance procedures were generally available to Plaintiffs throughout their confinement.  He also presented Michigan Department of Corrections (MDOC) records showing that

Plaintiffs did not properly appeal any relevant grievances through Step III of the grievance process prior to filing suit.  Plaintiffs argued that administrative remedies were not available to them because RUM Perttu thwarted their efforts to file grievances.

The undersigned has considered the evidence, testimony, and arguments presented during this bench trial.  The undersigned finds that RUM Perttu has proven by a preponderance of the evidence that Plaintiffs failed to exhaust their administrative remedies.  In addition, the undersigned finds that Plaintiffs have failed to prove that Perttu or any other MDOC official thwarted their efforts to file grievances against Perttu.  Accordingly, the undersigned respectfully recommends that the Court dismiss Plaintiffs' claims without prejudice.

## II.    Additional Relevant Procedural History

On April 23, 2020, Plaintiffs filed this action in federal court.  In their verified complaint, Plaintiffs allege that Perttu subjected them to sexual harassment and various forms of retaliation on numerous occasions between June 2019 and April 2020.  (ECF No. 1, PageID.4-39.)

On September 25, 2020, Perttu filed a motion for summary judgment and supporting brief.  (ECF Nos. 34, 35.)  Perttu argued that Plaintiffs failed to properly exhaust their claims.  Plaintiffs responded to Perttu's motion, asserting that Perttu prevented them from utilizing the grievance process at the prison, and that administrative remedies were therefore unavailable.  (ECF No. 51.)  The undersigned entered an R&R that recommended the Court deny Perttu's motion for summary

6

judgment because there was a genuine issue of material fact as to whether Perttu thwarted the Plaintiffs' attempts to exhaust. (ECF No. 97, PageID.438.) On August 10, 2021, the Court adopted the R&R. (ECF No. 105.)

During a telephone status conference on August 31, 2021, Perttu requested a bench trial on the issue of exhaustion pursuant to *Lee v. Willey*, 789 F.3d 673 (6th Cir. 2015). (ECF No. 117.) The undersigned granted this request and set the bench trial for November 4, 2021. (ECF No. 118.) On October 20, 2021, the undersigned held the final pretrial conference for the exhaustion bench trial, during which the parties indicated that they had all materials necessary to proceed. (ECF No. 138.)

## III. Summary of Testimony

During the bench trial, the parties presented a total of nine non-party witnesses in addition to providing their own testimony. To establish the general availability of the grievance process at AMF, RUM Perttu presented AMF's Grievance Coordinator, the MDOC's Grievance Manager, and AMF's Prison Rape Elimination Act (PREA) Coordinator. To support their claims of thwarting, Plaintiffs presented six fellow prisoners who allegedly witnessed RUM Perttu's destruction of grievances. Upon objection, only five were permitted to testify. Richards and Kissee also testified on their own behalf. RUM Perttu then took the stand to rebut the allegations of thwarting. Each Plaintiff was given the opportunity to examine each witness.

### a. MDOC Grievance Manager Richard Russell

On direct examination, Russell testified that he has served as the Grievance Manager for the MDOC for twelve-and-a-half years. Russell walked through the

grievance procedure set forth in MDOC Policy Directive (P.D.) 03.02.130, which was admitted into evidence as Defendant's Exhibit A.  According to Russell, grievance forms are available in every housing unit in an MDOC facility.

Russell testified that when a prisoner appeals a grievance through Step III of the procedure, the Step III grievance form is sent directly to his office in Lansing, where technicians log the grievance information in a database for tracking purposes, and then Russell and his staff review the grievance and render a decision, completing the grievance procedure.[4]

After discussing the grievance procedure, Russell identified Richards's Step III Grievance Report ("Step III Report") and accompanying grievances, which were admitted into evidence as Defendant's Exhibit C1.  Based on Richards's Step III Report, Russell explained that Richards filed 26 grievances between June 2019 and May 2020.  He then turned to the particulars of the six grievances summarized below.

---

[4]   During his testimony, Russell asserted that the claims contained within a prisoner's grievance are exhausted upon the prisoner filing his Step III appeal.  As discussed below, this assertion is incorrect.

| Grievance No. | Person Named | Allegation | Date or Date Range of Incident(s) | Results at Step I | Results at Step II | Results at Step III |
|---|---|---|---|---|---|---|
| AMF-19-08-1760-28B (ECF No. 153, PageID.726-729 (Def.'s Exh. C1).) | None | Richards learned that he was placed on a transfer list to level four facility and was stressed due to potential racial violence at the facility. | August 18, 2019 | Rejected as Vague | Rejected as Untimely | Rejection Upheld |
| AMF-19-09-1840-27a (ECF No. 153, PageID.730-733 (Def.'s Exh. C1).) | Hearings Officer | Richards had not received his requested misconduct appeal form, despite his 1st and 5th Amendment rights to appeal. | September 1, 2019-September 4, 2019 | Rejected as Non-Grievable | Rejected as Untimely | Rejection Upheld |
| AMF-19-12-2546-28b (ECF No. 153, PageID.738-741 (Def.'s Exh. C1).) | Director Washington, Warden Lesatz, RUM Neimi, ARUS Deforge, RUM Perrtu | Richards's anticipated transfer to a level four facility constitutes 1st Amendment retaliation, 8th Amendment cruel and unusual punishment, and violates the Equal Protection Clause. | December 23, 2019 | Rejected as Vague | Rejection Upheld | Rejection Upheld |
| AMF-20-01-6-22B (ECF No. 153, PageID.734-737 (Def.'s Exh. C1).) | Warden Lesatz, RUM Perrtu, ADW Snieder | Richards was experiencing psychosomatic symptoms as a result of his continued, and, due to his history of mental illness, unconstitutional confinement in administrative segregation. | January 3, 2020 | Denied | Denied | Denied |
| AMF-20-01-139-12di (ECF No. 153, PageID.721-725 (Def.'s Exh. C1).) | Warden Lesatz, RUM Perrtu, ADW Snieder | Richards's medical kites were being ignored in deliberate indifference to his medical needs. | January 23, 2020 | Denied | Denied | Rejected Based on Richards' Inadequate Attempt to Resolve his Issue Prior to Filing |
| AMF-20-04-660-27c (ECF No. 153, PageID.717-720 (Def.'s Exh. C1).) | Warden Taskila, ADW Neimi | Richards's medical kites were being ignored in deliberate indifference to his medical needs. | April 10, 2020 | Rejected as Non-Grievable | Rejection Upheld | Rejection Upheld |

Russell explained that grievance identifier AMF-20-01-139-12di was rejected at Step III based on Richards's inadequate attempt to resolve the issue with staff prior to filing his grievance.  Grievance identifier AMF-19-08-1760-28B was rejected as vague at Step I, and as untimely at Step II.  Grievance identifier AMF-19-09-1840-27a was rejected as non-grievable at Step I, and as untimely at Step II.  Grievance identifiers AMF-20-01-6-22B and AMF-20-04-660-27c did not discuss excessive force, sexual assault, or the incitement of violence towards Richards. And, finally, grievance identifier AMF-19-12-2546-28b was rejected pursuant to MDOC policy at all steps.

 After discussing Richards's Step III Report and relevant grievances, Russell identified Pruitt's Step III Report, which was entered into evidence as Defendant's Exhibit D1.  As shown below, Pruitt did not appeal any grievances through Step III of the process during the relevant period.

### MDOC Prisoner Step III Grievance Report
#### 1/1/2015 to Present

| Prisoner #: | 708518 | Last Name: | Pruitt | | | First Name: | Kenneth | | | |

| Step III Rec'd | Grievance Identifier | Grievance Catagory | Facility | Step I Received Date | Resolved | Partially Resolved | Denied | Rejected | Closed | Date Mailed |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/23/2021 | AMF-21-01-0084-28A | 28A | 2 | 1/14/2021 | ☐ | ☐ | ☐ | ☑ | ☑ | 5/12/2021 |

Notes:

(ECF No. 135, PageID.628 (Def.'s Exh. D1).)

Russell then identified Kissee's Step III Report, entered into evidence as Defendant's Exhibit E1, which reflected that Kissee also did not appeal any grievances through Step III during the relevant time period.

## MDOC Prisoner Step III Grievance Report
### 1/1/2015 to Present

Prisoner #:  575639     Last Name:  Kissee     First Name:  Robert

| | Step III Rec'd | Grievance Identifier | Grievance Catagory | Facility | Step I Received Date | Resolved | Partially Resolved | Denied | Rejected | Closed | Date Mailed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ✕ | 10/8/2020 | AMF-20-09-1549-27B | 27B | 2 | 9/17/2020 | ☐ | ☐ | ☐ | ☑ | ☑ | 12/7/2020 |
| Notes: | | | | | | | | | | | |
| | 3/11/2016 | AMF-16-02-0330-19a | 19a | 2 | 2/1/2016 | ☐ | ☐ | ☑ | ☐ | ☑ | 6/7/2016 |
| Notes: | | | | | | | | | | | |
| | 3/9/2016 | AMF-16-02-0355-17a | 17a | 2 | 2/3/2016 | ☐ | ☐ | ☑ | ☐ | ☑ | 3/22/2016 |
| Notes: | | | | | | | | | | | |
| | 3/8/2016 | AMF-16-02-0407-28j | 28j | 2 | 2/9/2016 | ☐ | ☐ | ☐ | ☑ | ☑ | 3/22/2016 |
| Notes: | | | | | | | | | | | |

(ECF No. 154, PageID.745 (Def.'s Exh. E1).)

On cross examination, Russell discussed grievance identifier <u>AMF-20-01-6-22B</u> in more detail. In that grievance, Richards complained of stress-related symptoms arising out of long-term administrative segregation. (ECF No. 153, PageID.737 (Def.'s Exh. C1).) While the grievance did not touch on sexual harassment, retaliation, or the incitement of violence against Richards, Russell conceded that he was unfamiliar with the particularities of Plaintiffs complaint, and therefore whether the grievance exhausted any of Plaintiffs' claims. He did, however, acknowledge that the grievance had been denied on its merits at all steps.

When asked about the procedure for grievances rejected as non-grievable, Russell explained that a prisoner is still required to appeal such grievances through Step III of the process because the Warden at Step II, or Russell's office at Step III,

11

may ultimately determine that the issue is in fact grievable.

Finally, Russell explained that Step III grievances are sent directly to his office via institutional mail or through the United States Postal Service. Every Step III grievance that Russell receives is delivered in a sealed envelope. According to Russell, neither his staff nor the technicians tasked with logging grievance data alter the grievances prior to review. Instead, his office maintains all grievance records in their original form.

### b. AMF Grievance Coordinator Thomas Hamel

Following Russell's testimony, Perttu called the Thomas Hamel to testify. On direct examination, Hamel testified that he has served as the grievance coordinator at AMF for nearly three years, and previously served as a grievance coordinator at another MDOC facility. Hamel explained that when he receives a Step I grievance, he assigns it an identifier, and logs it into the database. The database keeps track of the number of grievances that a prisoner files and the types of grievances that are submitted. Hamel has no discretion as to whether to process Step I grievances. If a grievance concerns sexual harassment, Hamel said that he forwards the grievance to the AMF PREA Coordinator.

In addition to discussing the grievance process, Hamel discussed the particulars of grievance collection at AMF. According to Hamel, if a prisoner wishes to file a Step I grievance, he can obtain a Step I grievance form within his unit. He can then place the grievance directly in the unit mailbox to be delivered to Hamel or ask a staff member to place the grievance in the mailbox. Later, a staff member will

collect mail from the units and take it to the mailroom.  Once there, mailroom staff will sort the mail, and place it in the appropriate mailboxes.  Hamel then visits his mailbox, uses his key to remove his mail, places it in his briefcase, and takes it to his office, where he processes all grievances.  As the Grievance Coordinator, Hamel never enters the housing units to collect the mail himself.  He does not have keys to the unit mailboxes, and he only has access to the mailroom when the mailroom staff are present.

After discussing the mail retrieval process, Hamel offered additional testimony regarding the database he utilizes.  According to Hamel, the database creates a Prisoner Grievance Summary Report ("Summary Report").  The Summary Report tracks the dates that grievance forms and appeals are received, as well as the response to the grievance at each step.  Importantly, Hamel explained that the columns on the Summary Report marked "I Recd" and "II Recd" indicate the date that Hamel received the grievance or appeal from the prisoner.  In contrast, because prisoners send their Step III grievance appeal directly to Russel in Lansing, the column marked "III Recd" indicates the date that Hamel received the Step III decision from Russel.  Per Hamel's testimony, a "d" on a Summary Report stands for "denied," an "r" stands for "resolved," an "x" stands for "rejected," and an "n" stands for "not addressed."  Hamel then identified the Summary Reports generated by the database for each plaintiff. The relevant portion of Richards's Summary Report, entered as Defendant's Exhibit C2, is shown below.

# Prisoner Grievance Summary Report

| Grievance | Number | Name | Facility | Issue | I Recd | I Dec | II Recd | II Dec | III Recd | III Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| 20182996 | 641715 | RICHARDS | AMF | 29Z | 12/19/2018 | d | | N | | |
| 20191760 | 641715 | RICHARDS | AMF | 28B | 8/21/2019 | x | 1/31/2020 | x | 5/6/2020 | x |
| 20191778 | 641715 | RICHARDS | AMF | 22G | 8/27/2019 | r | 2/4/2020 | d | 6/12/2020 | d |
| 20191840 | 641715 | RICHARDS | AMF | 27A | 9/5/2019 | x | 2/4/2020 | x | 5/6/2020 | x |
| 20192011 | 641715 | RICHARDS | AMF | 28E | 10/3/2019 | d | 1/31/2020 | x | 4/30/2020 | d |
| 20192422 | 641715 | RICHARDS | AMF | 28E | 12/3/2019 | x | 2/21/2020 | x | 6/12/2020 | x |
| 20192546 | 641715 | RICHARDS | AMF | 28B | 12/27/2019 | x | 1/14/2020 | x | 3/12/2020 | x |
| 20192547 | 641715 | RICHARDS | AMF | 27B | 12/27/2019 | x | 1/14/2020 | x | 3/3/2020 | x |
| 20192548 | 641715 | RICHARDS | AMF | 27B | 12/27/2019 | x | 1/14/2020 | x | 3/18/2020 | x |
| 20200006 | 641715 | RICHARDS | AMF | 22B | 1/7/2020 | r | 2/10/2020 | d | 4/30/2020 | d |
| 20200029 | 641715 | RICHARDS | AMF | 28B | 1/7/2020 | x | 1/22/2020 | x | 3/12/2020 | x |
| 20200138 | 641715 | RICHARDS | AMF | 14E | 1/27/2020 | d | 2/21/2020 | d | 6/12/2020 | d |
| 20200139 | 641715 | RICHARDS | AMF | 28I | 1/27/2020 | d | 2/28/2020 | d | 5/27/2020 | x |
| 20200188 | 641715 | RICHARDS | AMF | 15B | 1/31/2020 | d | 2/21/2020 | d | 6/12/2020 | d |
| 20200288 | 641715 | RICHARDS | AMF | 17A | 2/20/2020 | r | 3/18/2020 | d | 7/23/2020 | d |
| 20200383 | 641715 | RICHARDS | AMF | 27Z | 3/3/2020 | x | 3/18/2020 | x | 7/27/2020 | x |
| 20200437 | 641715 | RICHARDS | AMF | 15F | 3/10/2020 | d | 4/16/2020 | d | 9/1/2020 | d |
| 20200438 | 641715 | RICHARDS | AMF | 21Z | 3/10/2020 | r | 4/16/2020 | d | 9/1/2020 | d |
| 20200544 | 641715 | RICHARDS | AMF | 28B | 3/24/2020 | x | 4/16/2020 | x | 9/16/2020 | x |
| 20200588 | 641715 | RICHARDS | AMF | 08A | 3/31/2020 | r | 5/5/2020 | d | 9/1/2020 | d |
| 20200641 | 641715 | RICHARDS | AMF | 28B | 4/9/2020 | x | 4/28/2020 | x | 9/16/2020 | x |
| 20200651 | 641715 | RICHARDS | AMF | 28B | 4/10/2020 | x | 4/28/2020 | x | 9/16/2020 | x |
| 20200654 | 641715 | RICHARDS | AMF | 12B1 | 4/14/2020 | d | | N | | |
| 20200655 | 641715 | RICHARDS | AMF | 09AT | 4/14/2020 | d | 5/5/2020 | d | 9/1/2020 | d |
| 20200657 | 641715 | RICHARDS | AMF | 28B | 4/14/2020 | x | 5/5/2020 | x | 9/16/2020 | x |
| 20200658 | 641715 | RICHARDS | AMF | 27C | 4/14/2020 | x | 5/5/2020 | x | 9/16/2020 | x |
| 20200659 | 641715 | RICHARDS | AMF | 28A | 4/14/2020 | x | 5/5/2020 | x | 8/12/2020 | x |
| 20200660 | 641715 | RICHARDS | AMF | 27C | 4/14/2020 | x | 5/5/2020 | x | 9/16/2020 | x |
| 20200661 | 641715 | RICHARDS | AMF | 28A | 4/14/2020 | x | 5/5/2020 | x | 8/12/2020 | x |
| 20200853 | 641715 | RICHARDS | AMF | 28F | 5/13/2020 | x | | N | | |

(ECF No. 135-5, PageID.621 (Def.'s Exh. C2).)

Based on Richards's Summary report, Hamel testified that Richards had completed four grievances through Step III of the grievance process prior to April 2020 — all of which were rejected.

From there, Hamel moved to Pruitt's Summary Report, which was entered into evidence as Defendant's Exhibit D2, and is shown in pertinent part below.

14

# Prisoner Grievance Summary Report

| Grievance | Number | Name | Facility | Issue | I Recd | I Dec | II Recd | II Dec | III Recd | III Dec |
|-----------|--------|------|----------|-------|--------|-------|---------|--------|----------|---------|
| 20190425 | 708518 | PRUITT | AMF | 28B | 2/20/2019 | x | | N | | |
| 20191168 | 708518 | PRUITT | AMF | 27Z | 6/3/2019 | x | | N | | |
| 20191864 | 708518 | PRUITT | AMF | 28B | 9/10/2019 | x | | N | | |
| 20192376 | 708518 | PRUITT | AMF | 01H | 11/22/2019 | r | | N | | |
| 20200712 | 708518 | JUNIOR | AMF | 21C | 4/21/2020 | d | | N | | |
| 20201032 | 708518 | PRUITT | AMF | 22C | 6/23/2020 | d | | N | | |
| 20201094 | 708518 | PRUITT | AMF | 17B | 7/1/2020 | d | | N | | |
| 20201246 | 708518 | PRUITT | AMF | 11G | 7/27/2020 | d | | N | | |
| 20201362 | 708518 | PRUITT | AMF | 17A | 8/14/2020 | d | | N | | |
| 20201405 | 708518 | PRUITT | AMF | 17F | 8/18/2020 | d | | N | | |
| 20201406 | 708518 | PRUITT | AMF | 09DT | 8/18/2020 | d | | N | | |
| 20201464 | 708518 | PRUITT | AMF | 08H | 8/27/2020 | d | 10/1/2020 | d | | |
| 20201517 | 708518 | PRUITT | AMF | 17A | 9/10/2020 | d | | N | | |
| 20201591 | 708518 | PRUITT | AMF | 17Z | 9/23/2020 | d | | N | | |

(ECF No. 135-8, PageID.635 (Def.'s Exh. D2).)

Hamel explained that from June 2019 to May 2020, Pruitt filed four grievances, none of which were appealed through Step III.

Finally, Hamel turned to Kissee's Summary Report, which was entered into evidence as Defendant's Exhibit E2, and shown below.

# Prisoner Grievance Summary Report

| Grievance | Number | Name | Facility | Issue | I Recd | I Dec | II Recd | II Dec | III Recd | III Dec |
|-----------|--------|------|----------|-------|--------|-------|---------|--------|----------|---------|
| 20182036 | 575639 | KISSEE | AMF | 28I | 8/15/2018 | x | | N | | |
| 20182049 | 575639 | KISSEE | AMF | 17Z | 8/17/2018 | d | | N | | |
| 20182142 | 575639 | KISSEE | AMF | 17B | 8/30/2018 | d | | N | | |
| 20200825 | 575639 | KISSEE | AMF | 12F3 | 5/11/2020 | d | 5/20/2020 | N | | |
| 20201549 | 575639 | KISSEE | AMF | 27B | 9/17/2020 | x | 9/29/2020 | x | 12/14/2020 | x |

(ECF No. 135-11, PageID.647 (Def.'s Exh. E2).)  Kissee filed only one grievance between June 2019 and May 2020, and he did not appeal that grievance through Step III of the process.

15

After reviewing the Summary Reports, Hamel testified that he never failed to process grievances, kites, or requests for Step II or Step III grievance forms, or prevented any prisoners from filing grievances.  He also testified that he had no reason to believe that RUM Perttu ordered other prisoners to destroy Plaintiffs' grievances, nor that the Warden ordered such destruction.  Based on his evaluation of Plaintiffs' reports, Hamel testified that the grievance process was available to Plaintiffs between June 2019 and May 2020.

On cross examination, Hamel explained that he receives grievances through institutional mail.  When asked about his relationship with RUM Perttu, Hamel testified that he previously worked with Perttu at Ojibway Correctional Facility, but that they did not have a relationship outside of work.

### c. AMF PREA Coordinator Craig Cummings

Following Hamel's testimony, RUM Perttu called Craig Cummings. Cummings testified that he has served as the Inspector and PREA Coordinator at AMF for six years.  As the Inspector and PREA Coordinator, Cummings is tasked with monitoring safety and security at the facility, as well as PREA grievances and investigations.  Per Cummings, PREA grievances are those submitted by prisoners alleging sexual abuse or harassment.  The PREA grievance procedure is set forth in MDOC P.D. 03.03.140, admitted as Defendant's Exhibit B.

According to Cummings, when a prisoner wants to file a PREA grievance, he must first obtain a grievance form from the facility staff.  He must then place the form in the unit mailbox or ask staff to place the form in the unit mailbox.  That mail

then finds its way to Cummings's mailbox in the administrative office.  Cummings does not have direct access to the unit mailboxes, only has access to the mailroom when the mailroom staff are working (from 8:00am to 4:30pm), and is the only individual with access to his mailbox.  After retrieving the grievances from his mailbox, Cummings processes them by making copies and assigning identifiers and investigators.  He also identifies whether the grievance alleges sexual abuse or sexual harassment.  From there, another staff member enters the information into the AIM database.  Cummings then returns the PREA grievance to the prisoner.  Cummings testified that he responds to every PREA grievance he receives — he has no discretion in processing the grievances.

After describing the general PREA grievance process, Cummings discussed Plaintiffs' AIM records. According to Cummings, AIM records reflect all PREA investigations initiated for any given prisoner.  Richards's AIM record, entered as Defendant's Exhibit C3, is shown below.



(ECF No. 135-6, PageID.624 (Def.'s Exh. C3).)  Based on Richards's AIM record, Cummings testified that Richards did not file any PREA grievances at AMF.

Pruitt's AIM record, entered as Defendant's Exhibit D3, is shown below.



(ECF No. 135-9, PageID.637 (Def.'s Exh. D3).)  While Pruitt did file PREA grievances during his stay at AMF, he did not file any grievances between 2019 and 2020, the relevant period for Plaintiffs' claims.

Finally, Kissee's AIM record, entered as Defendant's Exhibit E3, is shown below.



(ECF No. 135-12, PageID.649 (Def.'s Exh. E3).)  Based on this record, Cummings testified that, like Richards, Kissee did not file any PREA grievances at AMF.

After reviewing the AIM records, Cummings testified that he never failed to process PREA grievances, kites, or requests for Step II forms, or prevented any

prisoners from filing grievances.  He also testified that he had no reason to believe that RUM Perttu prevented Plaintiffs from filing PREA grievances, nor that the Warden ordered others to destroy Plaintiffs' grievances.

On cross examination, Cummings acknowledged that, in addition to the formal, written grievance process, a prisoner can lodge a verbal complaint with staff or call the PREA hotline.  When a prisoner lodges a verbal complaint, staff are required to report that complaint to their supervisor.  Cummings explained that PREA grievance forms are kept in the housing units, and the PREA hotline number is posted in all of the housing units.  If a prisoner in administrative segregation wishes to file a PREA grievance, they are required to ask staff for the Step I form.

When asked whether he recalled meeting with Richards regarding a PREA complaint, Cummings denied such recollection, but said that, had it happened, it would have been recorded.

### d.  Plaintiffs' Non-Party Witnesses

Plaintiffs called a total of six individuals, five of whom were incarcerated with Plaintiffs at AMF during the relevant time period.  The sixth, Cody Ian Simmons, was not placed in AMF until after the complaint was filed, and, upon a relevance objection from RUM Perttu, did not testify. The remaining witnesses are Deliun Kennon-Keyonte Stevenson, Larry Taylor, Michael Richard Jackson, Cleveland Spencer, and Michael D. Cornelius.

Upon questioning from Richards, several prisoners agreed that they watched RUM Perttu destroy, or that Perttu asked them to destroy, Richards's grievances

during the relevant period. Specifically, when asked whether he watched Perttu throw away grievances with Richards's name on them on March 20, 2020 and March 25, 2020, Stevenson said that he did. When asked whether Perttu approached him and told him to destroy Richards's grievances on April 18, 2020 and April 20, 2020, Jackson said that he did.  When asked whether he witnessed Perttu rip up some of Richards's grievances on April 6, 2020, Taylor said that he did.  When asked whether he observed Perttu destroy grievances in early 2019 and late 2020, Spencer said that he did, though he could not testify that they were Richards's grievances.  Cornelius said that he watched Perttu rip up Richards's grievances at some point in late 2019 or early 2020, but he was not sure when.

Stevenson further testified on direct that some of his own grievances were thrown out by AMF staff, and that he has received Richards's mail from AMF staff before. Cornelius testified that he once overheard Perttu tell Richards, "if you don't give me a blowjob, I am going to put you in the hole," while destroying Richards's grievances.  Cornelius also asserted that since signing his declaration for this case, one of the AMF Corrections Officers has issued him retaliatory misconduct tickets. Jackson said that when Perttu approached him to destroy Richards's grievances, he was able to look at the contents of the grievances, which alleged that Perttu was sexually harassing Richards.  Jackson also explained that instead of destroying grievances at Perttu's request, he retained them, told various Corrections Officers that Perttu had given the grievances to him, and then ultimately returned them to Richards when he was placed in administrative segregation in November of 2020.

20

Taylor explained that Perttu's general demeanor towards Richards was "one of anger
and disgust," and that Perttu threatened Richards on multiple occasions, though he
could not recall exactly when.

Many of the men testified as to how the grievance process worked in
administrative segregation. Taylor, Jackson, Spencer, and Cornelius all indicated
that when a prisoner is in administrative segregation, he is completely dependent
upon facility staff to obtain grievance forms and to get the completed forms to the
grievance coordinator.   Taylor specified that there are no vantage points in
administrative segregation from which a prisoner can watch the staff put his
grievances in the unit mailbox.

On cross examination, the witnesses were more specific about the
circumstances surrounding Perttu's alleged destruction of Richards's grievances.
Stevenson admitted that the first time he saw Perttu destroy Richards's grievances,
Perttu passed his cell with the grievances in hand in full walking stride.  The second
time Stevenson saw Perttu destroy Richards's grievances, Perttu had stopped only
briefly to collect Stevenson's mail with Richards's grievances in hand.  Stevenson
admitted that the grievances were only in view for a matter of seconds, and he could
not discern the contents of the grievances except for Richards's name.  In contrast,
Taylor testified that he did not see Richards's name on the grievances he watched
Perttu destroy, but knew they were written by Richards because he was locked in the
same wing as Richards at the time and watched Perttu pick the grievances up from
Richards's cell.  According to Taylor, he overheard Perttu talking to Richards about

the grievances, so he knew that the grievances concerned sexual harassment.  When asked about the specifics surrounding his observations, Spencer indicated that he never saw Richards's name on the grievances Perttu destroyed, or heard Perttu talking about them.

Also on cross-examination, the witnesses acknowledged difficulty in remembering the exact dates on which they observed Perttu destroying grievances. Jackson testified on cross that he was asked to destroy Richards's grievances on March 19, 2020, but acknowledged that in his prior deposition, he did not allege he was asked to destroy grievances on that date.  Spencer could not identify when or where he observed Perttu destroying grievances.  Cornelius also admitted difficulty in remembering when he observed Perttu threatening Richards and destroying Richards's grievances.  He further testified that he did not write the declaration that that Plaintiffs previously filed in this case.  Although he said the allegations in the declaration were true, he admitted that he did not know whether the dates in the declaration were accurate, as he did not supply them.

On redirect, Cornelius asserted that he read the declaration he signed, and agreed with the contents, but not necessarily the dates.

### e.  Plaintiffs' Testimony

After calling their non-party witnesses, Richards and Kissee testified on their own behalf.  Richards testified that, on August 20, 2019, January 1, 2020, and June 15, 2020, as well as on the dates discussed by the non-party witnesses, Perttu either destroyed his grievances or prevented them from being processed.  He testified that

he never received tracking numbers for these grievances.

On cross examination, Richards testified that he could not speak to specific dates on which his grievances were obstructed or destroyed off-hand and asserted that there were specific instances of thwarting that were not discussed by the witnesses but could be found in his complaint.  Richards also acknowledged that he assisted in writing most of the affidavits and declarations in the case.

Kissee then testified as to his own attempts to file grievances at AMF.  Kissee said that he tried to submit regular and PREA grievances on multiple occasions.  However, every time he tried to utilize the grievance process, he was told to retrieve the necessary forms from RUM Perttu.  Kissee also testified to an incident in which he was assaulted by another prisoner, and that prisoner stated, "Perttu says hello." According to Kissee, Perttu had such a significant influence over staff and other prisoners that the grievance process was unavailable to him.

On cross examination, Kissee acknowledged that the assault occurred after Plaintiffs filed their complaint.  Kissee also acknowledged that he attempted to file PREA grievances on January 21, 2020 but could not recall what incident the grievances addressed. Nor could he recall the exact date that he attempted to file three additional PREA grievances regarding Perttu's attempted solicitation of sexual favors.

### f.  RUM Perttu's Testimony

RUM Perttu was the final witness to testify in the bench trial. Perttu stated that he served as the Resident Unit Manager for the administrative segregation

housing units — Units One, Two, and Three — at AMF from 2019 to 2020.  RUM Perttu's shift at AMF ran from 7:30am to 3:30pm.  As the RUM, Perttu was required to complete rounds each day before 10:00am.  Perttu explained that when he did rounds, he utilized wands in the units that scanned each cell door as he passes, logging the time and location of each scan.  The data from these wands is downloadable, and the download is how the MDOC ensures that RUMs are completing their rounds.  Perttu did not, however, provide this data.

RUM Perttu further testified that each housing unit at AMF is a separate, V-shaped building that is comprised of four wings.  A-wing and B-wing are on one side of the V-shape, and C-wing and D-wing are on the other.  Each unit has a trash can at the apex of the V-shaped hall.  Perttu said that he does not have a usual practice with regards to where he begins his rounds.

Perttu then explained that if prisoners had mail that needed to be picked up while he was on rounds, he would pick up their mail and fold it in half while he walked.  However, the mail was usually picked up by other AMF staff before his rounds, so Perttu did not do so often.  Perttu stated that he never mixed mail between units or entered one unit holding mail from another unit.  He also never took mail out of the unit mailboxes, as he did not have a key to access them.  Nor did he have access to the mailroom in the absence of mailroom staff.

After discussing his procedure for completing rounds, RUM Perttu presented his recollection of the lock-up history of the prisoners who had testified.  Though Perttu did not admit a lock history for any of the prisoners into evidence, he testified

24

that on March 20, 2020, Stevenson was locked in Unit One while Richards was locked in Unit Three.  On March 25, Stevenson was locked in Unit Two while Richards was locked in Unit Three.  Perttu also testified that Cornelius was not in administrative segregation at all during the relevant dates.  Perttu stated that when Richards and Spencer were locked in the same unit, Spencer was locked in B-wing, and Richards was locked in D-wing, so they would not have been able to see each other or communicate.

Finally, RUM Perttu discussed some of his time off.  According to Perttu, he was not working on April 5, 2020, because he was on a modified schedule due to covid-19.  Perttu could not recall whether he worked on April 15, 2020.  On June 1, 2020, Perttu was out sick.  And on January 1, 2020, Perttu was off due to the New Year's holiday.

According to Perttu, he never destroyed any grievances submitted by Plaintiffs, and the Warden never instructed him to destroy grievances.

On cross examination, Perttu testified that he always uses a wand during rounds, and that the records created by the wands cannot be altered.  With regards to the grievance process for prisoners in administrative segregation, Perttu explained that inmates can request a grievance form from any staff member.  Once completed, the staff place the grievance forms in the unit mailbox.  It is not possible for the staff to place the forms in the wrong mailbox, as there is only one per unit.  Although Perttu conceded that prisoners in administrative segregation must rely on the good faith of the facility staff to submit their grievances, Perttu said he did not believe that

25

accessing the grievance process was more difficult for those prisoners.  RUM Perttu also testified that, during the relevant time, he was not aware of any shortages in grievance forms among his units.

According to Perttu, he never received complaints from Richards regarding sexual harassment.  He was also never informed that Richards had made such complaints against him to other AMF staff.  Perttu acknowledged that the office in which he sorts mail is not equipped with a camera.  He also acknowledged that once mail is given to the United States Postal Services, AMF staff cannot account for any lost grievances or appeals.  There was no redirect of Perttu.

## IV.    Analysis

As stated above, the undersigned must decide whether Perttu has proven, by a preponderance of the evidence, that Plaintiffs failed to properly exhaust their claims before filing suit. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007); *Lee*, 789 F.3d at 678. While Perttu bears this initial burden, once he shows that there was a generally available administrative remedy, and that the prisoner did not exhaust that remedy, the burden shifts to Plaintiffs to come forward with evidence showing that his circumstances made the existing and generally available administrative remedies effectively unavailable to him. *Alexander v. Calzetta*, No. 2:16-CV-13293, 2018 WL 8345148, at *6 (E.D. Mich. Nov. 30, 2018).

Based on the testimony, evidence, and argument presented during the hearing, the undersigned concludes that Perttu has carried his initial burden.

### a. Perttu established that Plaintiffs failed to exhaust any of their claims before filing suit

To properly exhaust administrative remedies, prisoners must complete the available administrative review process in accordance with the applicable deadlines and other procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). For MDOC prisoners with claims unrelated to sexual abuse or harassment, that administrative review process is most often the grievance procedure set forth in P.D. 03.02.130. For MDOC prisoners with sexual abuse or harassment claims, it is the grievance procedure set forth in P.D. 03.03.140.

As discussed above, grievance identifier <u>AMF-20-01-6-22B</u> was addressed on the merits at all three steps.[5] (*See* ECF No. 135-5, PageID.621 (Def.'s Exh. C2).) In other words, Richards completed the grievance procedure in accordance with the rules set forth in P.D. 03.02.130 with respect to grievance identifier <u>AMF-20-01-6-22B</u>. However, the evidence shows that it was completed ***after*** Plaintiffs filed suit. The relevant portion of Richards's Summary report is shown below.

---

[5]    Richards's Summary Report indicates that the grievance was resolved at Step I and Richards's subsequent appeals were denied. (ECF No. 153, PageID.737 (Def.'s Exh. C1).)

## Prisoner Grievance Summary Report

| Grievance | Number | Name | Facility | Issue | I Recd | I Dec | II Recd | II Dec | III Recd | III Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| 20182996 | 641715 | RICHARDS | AMF | 29Z | 12/19/2018 | d | | N | | |
| 20191760 | 641715 | RICHARDS | AMF | 28B | 8/21/2019 | x | 1/31/2020 | x | 5/6/2020 | x |
| 20191778 | 641715 | RICHARDS | AMF | 22G | 8/27/2019 | r | 2/4/2020 | d | 6/12/2020 | d |
| 20191840 | 641715 | RICHARDS | AMF | 27A | 9/5/2019 | x | 2/4/2020 | x | 5/6/2020 | x |
| 20192011 | 641715 | RICHARDS | AMF | 28E | 10/3/2019 | d | 1/31/2020 | x | 4/30/2020 | d |
| 20192422 | 641715 | RICHARDS | AMF | 28E | 12/3/2019 | x | 2/21/2020 | x | 6/12/2020 | x |
| 20192546 | 641715 | RICHARDS | AMF | 28B | 12/27/2019 | x | 1/14/2020 | x | 3/12/2020 | x |
| 20192547 | 641715 | RICHARDS | AMF | 27B | 12/27/2019 | x | 1/14/2020 | x | 3/3/2020 | x |
| 20192548 | 641715 | RICHARDS | AMF | 27B | 12/27/2019 | x | 1/14/2020 | x | 3/18/2020 | x |
| 20200006 | 641715 | RICHARDS | AMF | 22B | 1/7/2020 | r | 2/10/2020 | d | 4/30/2020 | d |

(ECF No. 135-5, PageID.621 (Def.'s Exh. C2).)

As explained by Hamel, the column in the Summary Report marked "III Recd" indicates when Hamel received the Step III response. Hamel received the Step III response to AMF-20-01-6-22B on April 30, 2020. Plaintiffs filed their complaint on April 23, 2020. As such, Richards could not have received the response until after Plaintiffs filed this suit. The grievance procedure outlined in P.D. 03.02.130 is not completed for exhaustion purposes until the prisoner receives the Step III response. *Ross v. Duby*, No. 1:09-CV-531, 2010 WL 3732234 (W.D. Mich. Sept. 17, 2010) (determining that the plaintiff had not exhausted his claim because the response to his Step III grievance was issued after the complaint was filed). Because exhaustion is a precondition to filing a suit, Plaintiffs cannot look to AMF-20-01-6-22B to exhaust any claims in this case. *Roberts v. Lamanna*, 45 F. App'x 515, 516 (6th Cir. 2002) (explaining that a plaintiff cannot exhaust administrative remedies "during the pendency of the action").

While grievance identifier AMF-20-01-6-22B was the only grievance to be

addressed on the merits, there are additional circumstances under which a rejected grievance may nevertheless exhaust the claims therein. For example, when a grievance is rejected for the first time at Step III based on a pre-existing procedural defect, the claims in the grievance are considered exhausted. *Raper v. Controneo*, 2018 WL 2928188, at *1 (W.D. Mich., June 12, 2018); *Sedore v. Greiner*, 2020 WL 8837441, at *7 (E.D. Mich. Sept. 21, 2020).   However, it is unnecessary to determine whether the remaining grievances fall within these exceptions for the purposes of this case.  The Step III responses to grievance identifiers AMF-19-08-1760-28B, AMF-19-09-1840-27a, AMF-20-01-139-12di, and AMF-20-04-660-27c were not delivered to AMF until after Plaintiffs filed this suit.

## Prisoner Grievance Summary Report

| Grievance | Number | Name | Facility | Issue | I Recd | I Dec | II Recd | II Dec | III Recd | III Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| 20182996 | 641715 | RICHARDS | AMF | 29Z | 12/19/2018 | d | | N | | |
| 20191760 | 641715 | RICHARDS | AMF | 28B | 8/21/2019 | x | 1/31/2020 | x | 5/6/2020 | x |
| 20191778 | 641715 | RICHARDS | AMF | 22G | 8/27/2019 | r | 2/4/2020 | d | 6/12/2020 | d |
| 20191840 | 641715 | RICHARDS | AMF | 27A | 9/5/2019 | x | 2/4/2020 | x | 5/6/2020 | x |
| 20192011 | 641715 | RICHARDS | AMF | 28E | 10/3/2019 | d | 1/31/2020 | x | 4/30/2020 | d |
| 20192422 | 641715 | RICHARDS | AMF | 28E | 12/3/2019 | x | 2/21/2020 | x | 6/12/2020 | x |
| 20192546 | 641715 | RICHARDS | AMF | 28B | 12/27/2019 | x | 1/14/2020 | x | 3/12/2020 | x |
| 20192547 | 641715 | RICHARDS | AMF | 27B | 12/27/2019 | x | 1/14/2020 | x | 3/3/2020 | x |
| 20192548 | 641715 | RICHARDS | AMF | 27B | 12/27/2019 | x | 1/14/2020 | x | 3/18/2020 | x |
| 20200006 | 641715 | RICHARDS | AMF | 22B | 1/7/2020 | r | 2/10/2020 | d | 4/30/2020 | d |
| 20200029 | 641715 | RICHARDS | AMF | 28B | 1/7/2020 | x | 1/22/2020 | x | 3/12/2020 | x |
| 20200138 | 641715 | RICHARDS | AMF | 14E | 1/27/2020 | d | 2/21/2020 | d | 6/12/2020 | d |
| 20200139 | 641715 | RICHARDS | AMF | 28I | 1/27/2020 | d | 2/28/2020 | d | 5/27/2020 | x |
| 20200188 | 641715 | RICHARDS | AMF | 15B | 1/31/2020 | d | 2/21/2020 | d | 6/12/2020 | d |
| 20200288 | 641715 | RICHARDS | AMF | 17A | 2/20/2020 | r | 3/18/2020 | d | 7/23/2020 | d |
| 20200383 | 641715 | RICHARDS | AMF | 27Z | 3/3/2020 | x | 3/18/2020 | x | 7/27/2020 | x |
| 20200437 | 641715 | RICHARDS | AMF | 15F | 3/10/2020 | d | 4/16/2020 | d | 9/1/2020 | d |
| 20200438 | 641715 | RICHARDS | AMF | 21Z | 3/10/2020 | r | 4/16/2020 | d | 9/1/2020 | d |
| 20200544 | 641715 | RICHARDS | AMF | 28B | 3/24/2020 | x | 4/16/2020 | x | 9/16/2020 | x |
| 20200588 | 641715 | RICHARDS | AMF | 08A | 3/31/2020 | r | 5/5/2020 | d | 9/1/2020 | d |
| 20200641 | 641715 | RICHARDS | AMF | 28B | 4/9/2020 | x | 4/28/2020 | x | 9/16/2020 | x |
| 20200651 | 641715 | RICHARDS | AMF | 28B | 4/10/2020 | x | 4/28/2020 | x | 9/16/2020 | x |
| 20200654 | 641715 | RICHARDS | AMF | 12B1 | 4/14/2020 | d | | N | | |
| 20200655 | 641715 | RICHARDS | AMF | 09AT | 4/14/2020 | d | 5/5/2020 | d | 9/1/2020 | d |
| 20200657 | 641715 | RICHARDS | AMF | 28B | 4/14/2020 | x | 5/5/2020 | x | 9/16/2020 | x |
| 20200658 | 641715 | RICHARDS | AMF | 27C | 4/14/2020 | x | 5/5/2020 | x | 9/16/2020 | x |
| 20200659 | 641715 | RICHARDS | AMF | 28A | 4/14/2020 | x | 5/5/2020 | x | 8/12/2020 | x |
| 20200660 | 641715 | RICHARDS | AMF | 27C | 4/14/2020 | x | 5/5/2020 | x | 9/16/2020 | x |

(ECF No. 135-5, PageID.621 (Def.'s Exh. C2).)  The only remaining grievance at issue, grievance identifier <u>AMF-19-12-2546-28b</u>, was rejected as vague at all steps of the process.  (ECF No. 153, PageID.738-741 (Def.'s Exh. C1).)  Therefore, none of the grievances through which Richards asserts he exhausted his claims did, in fact, exhaust his claims prior to Plaintiffs filing their complaint.

Richards did not submit any sexual abuse or harassment grievances in accordance with P.D. 03.03.140.  (ECF No. 135-6, PageID.624 (Def.'s Exh. C3).) Plaintiff's Pruitt and Kissee did not complete any relevant grievances through either process.  (ECF No. 135-8, PageID.635 (Def.'s Exh. D2); ECF No. 135-9, PageID.637 (Def.'s Exh. D3); ECF No. 135-10, PageID.641-645 (Def.'s Exh. E1); ECF No. 135-12, PageID.649 (Def's Exh. E3).).  By providing the Step III Grievance Reports, relevant grievances, and AIM Reports, RUM Perttu has established that Plaintiffs failed to exhaust their administrative remedies with regards to all other claims.

### b.  Plaintiffs failed to show that administrative remedies were unavailable to them

Because the undersigned finds that RUM Perttu met his burden of proving, by a preponderance of the evidence, that administrative remedies were generally available, and that Plaintiffs failed to exhaust those remedies, the burden shifts to Plaintiffs to show that the grievance procedures were effectively unavailable to them. Here, Plaintiffs assert that the unavailability of the procedures was procured by RUM Perttu's destruction of grievances.

Ultimately, the testimony given by Plaintiffs' witnesses was either substantially guided by Richards's manner of questioning or wholly conclusory, and

often contradicted prior statements or documentary evidence admitted throughout the bench trial.  Even considering that witnesses testified to observing RUM Perttu destroying Richards's grievances, the witnesses' admissions concerning the circumstances surrounding their observations, paired with RUM Perttu's testimony regarding the layout of AMF, further undercut the credibility of Plaintiffs' witnesses. As such, the undersigned concludes that Plaintiffs' witnesses lacked credibility, and Plaintiffs failed to provide sufficient evidence that the grievance procedures were effectively unavailable to them.

### 1. The form of Richards's direct examinations undermined the credibility of witness testimony.

While each plaintiff was given the opportunity to examine each witness, Richards engaged in the most extensive examinations of the Plaintiffs' witnesses. While examining Plaintiffs' witnesses, Richards's relied on yes or no questions in which he provided the date and details of Perttu's alleged destruction of grievances, and the witnesses simply agreed.  For example, Richards asked Jackson whether, on April 20, 2020, Perttu came to Jackson's cell and asked him to flush Richards's grievances down the toilet.  Such questioning did not provide Plaintiffs' witnesses the opportunity to develop their testimony independently or demonstrate personal knowledge of the incidents.

This lack of personal knowledge first became apparent during Jackson's cross-examination, when he was asked about his encounter with RUM Perttu on March 19, 2020.  Jackson initially testified that Perttu had delivered grievances to his cell that day and asked him to rip them up.  However, this testimony contradicted Jackson's

prior affidavit.  Later, Larry Taylor testified that he did not remember whether the dates Richards was supplying were correct. Even upon refreshing his recollection with an affidavit previously filed in this case, Taylor could not identify the dates on which he observed RUM Perttu destroying Richards's grievances.  But the witnesses' lack of personal knowledge became most blatant when, upon objection, the Court directed Richards to reformulate his questions to Michael Cornelius rather than reading the dates to him.  Cornelius could not recall any of the specific dates when RUM Perttu allegedly destroyed Richards's grievances, and later admitted that he had signed his prior affidavit but had not written it or supplied the dates therein. During his own testimony, Richards conceded that he "assisted" in writing most of the affidavits and declarations filed in this case.

Aside from the Plaintiffs themselves, Stevenson, Taylor, Jackson, and Cornelius were the only witnesses to testify as to the destruction of grievances with particularity.   Kissee did not provide any specific dates of destruction in his testimony, and Richards had to refresh his own recollection before he could provide three additional dates of destruction outside of those offered by previous witnesses. The witnesses' overall inability to testify as to the dates and locations of RUM Perttu's alleged destruction of Plaintiffs' grievances casts significant doubt on the credibility of their testimony.

## 2. The circumstances surrounding the alleged observations of Perttu destroying grievances further undermines witness credibility.

Although Stevenson, Taylor, Jackson, and Cornelius testified that they personally observed Perttu destroy Richards's grievances, the circumstances under which the witnesses observed such destruction further undermines their credibility.

On cross-examination Stevenson testified that the first time he watched RUM Perttu destroy grievances, Perttu passed his cell in full walking stride and was only in his view for a matter of seconds. The second time, Perttu stopped in front of Stevenson's cell to collect his mail before continuing down the unit hallway and destroying Richard's grievances. Despite the miniscule window of time within which Stevenson observed Perttu, he testified that he could see all of the grievances in Perttu's hand and discern that they were written by Richards. Stevenson then testified that he could not read the incident date or contents of the grievance beyond Richards's name on either date.

Jackson agreed that throughout the months of February, March, and April 2020, RUM Perttu brought mail to his cell and, on some occasions, directed Jackson to destroy it. Jackson testified that he was housed in Unit Five, a general population unit, when all of this occurred, and that he retained some of the grievances, which he later gave to Richards.

On cross-examination, Taylor testified that he could not see the grievances or their contents as Perttu passed his cell, but that he was locked in the same wing as Richards at the time and observed Perttu taking the grievances from Richards's cell

door, reading them, and then talking to Richards about their contents, which allegedly focused on sexual harassment.

Cornelius testified that while he was locked up in Unit Four, a general population unit, he witnessed RUM Perttu threaten Richards and rip up grievances.

During RUM Perttu's direct examination, he explained that he managed the administrative segregation units — Units One through Three. He stated that he rarely collects mail from his units during rounds. When he does, he said that he is usually accompanied by another officer, and that he folds the mail in half to protect the prisoners' privacy. Perttu further testified that each housing unit is an independent building at AMF, and he never takes mail between units. He also never worked in the general population units during the relevant period, nor did he have access to the mailboxes therein. According to Perttu, Stevenson and Richards were locked in different housing units on March 20, 2020, and March 25, 2020.

Unfortunately, neither Plaintiffs or RUM Perttu provided documentary evidence of AMF's layout, where Plaintiffs and their witnesses were locked throughout the relevant time, or what dates and times RUM Perttu worked and did rounds. Such documents would have clarified the testimony of all of the witnesses and had the potential to bolster witness credibility. Nonetheless, Stevenson's claims that he was able to see the names written on grievances that Perttu allegedly destroyed in March 2020, despite his inability to see anything else written on the forms and contrary to Perttu's testimony that he folds over any mail he collects as he collects it, are unconvincing. So too is Taylor's testimony that he could discern the

34

number of grievances Richards's submitted on various occasions, as well as their contents.  Further, Cornelius's testimony that he watched Perttu take and destroy grievances in Unit Four, and Jackson's testimony that Perttu delivered prisoners' mail to him in Unit Five, lack credibility both because Perttu did not work in general population units, and because prisoners in general population units have the option to submit their grievances directly to the housing unit mailbox.

### 3. The evidence demonstrates that RUM Perttu could not, and in fact did not, intercept and destroy all grievances filed by Plaintiffs in the relevant time.

As an initial matter, the undersigned notes that even on the dates that RUM Perttu worked, he testified that he only works from 7:00am to 3:30pm.  Moreover, RUM Perttu did not work seven days a week every week from June 2019 to March 2020.  Indeed, on at least one of the dates on which Richards alleges Perttu destroyed his grievances, January 1, 2020, Perttu testified that he was not working due to the New Years holiday.

But even had Perttu been working every hour of every day, Richards's Step III Grievance Report demonstrates that Richards actually took advantage of the grievance procedure by filing Step I grievance forms twenty-six times between June 6, 2019, and April 23, 2020.  (ECF No. 153, PageID.705 (Def's Ex. C1).)  Kissee's Step III Grievance Report similarly demonstrates that he was able to take advantage of the grievance procedure by filing a Step I grievance form during the relevant time. (ECF No. 154, PageID.745 (Def.'s Exh. E1).)  Moreover, of Richards's six Step I grievance forms entered into evidence, three (grievance identifiers <u>AMF-19-12-2546-</u>

28b, AMF-20-01-6-22b, and AMF-20-01-1391-12di) specifically grieved RUM Perttu, undermining any allegation that Perttu sorted through the grievances and discarded those directed towards him.  (ECF No. 153, PageID.724,737,741 (Def.'s Exh. C1).)

Although the Plaintiffs' AIM records do not reflect that Plaintiffs accessed the PREA grievance procedure, they nevertheless undercut Plaintiffs' credibility.  P.D. 03.03.140(EE) requires prisoners to use a formal, written, two-step PREA grievance process to exhaust sexual assault claims.  However, consistent with the Prison Rape Elimination Act, 28 CFR § 115.252, the directive specifies that prisoners "shall not be required to submit a PREA grievance to a staff member who is the subject of the complaint. . . ." P.D. 03.03.140(JJ). Furthermore, the directive provides several options for prisoners reporting sexual harassment or abuse that, while not serving to exhaust claims, must nevertheless be documented by staff. For example, a prisoner may verbally report instances of sexual harassment to any MDOC employee, or through the Sexual Abuse Hotline. P.D. 03.03.140(Y). Plaintiffs' AIM records reflect that they never reported RUM Perttu, even after he allegedly destroyed numerous PREA grievances over the course of several months.  They did not tell Corrections Officers working in their units that RUM Perttu was harassing them or retaliating against them.  They did not inform healthcare staff.  They did not call the sexual abuse hotline posted in every unit.

In all, Richards's successful use of the grievance procedure outlined in P.D. 03.02.130 directly contradicts Plaintiffs' claim that administrative remedies were effectively unavailable, and Plaintiffs' failure use any of the alternative reporting

36

methods set forth in P.D. 03.03.140(Y) casts doubt on their alleged attempts to file PREA grievances.

### 4. Plaintiffs' assertion that Corrections Officers were unwilling to process their grievances under the direction of RUM Perttu was wholly conclusory.

Perhaps in acknowledgement of the far-fetched nature of asserting that RUM Perttu single-handedly intercepted every grievance written by all Plaintiffs over the course of ten months, Plaintiff Kissee testified that none of the Corrections Officers would process his grievances either because Perttu was their superior.  However, beyond this allegation, Plaintiffs provided no evidence that RUM Perttu so influenced the Corrections Officers who worked under him.  Aside from Kissee, none of the witnesses testified that Plaintiffs even tried to submit their grievances to Corrections Officers in their units, let alone that the Corrections Officers refused or destroyed such grievances at the direction of RUM Perttu.

Overall, the credibility of Plaintiffs' witnesses was undermined by their inability to independently recollect the time or location of RUM Perttu's alleged destruction of Plaintiff's grievances, as well as the unlikely circumstances under which they claimed they observed such destruction.  Plaintiffs' claim that RUM Perttu thwarted their attempts to exhaust is further undermined by Richards's Step III Report and attached grievances, demonstrating that the grievance procedure was not effectively unavailable.  It is also undermined by the common sense understanding that RUM Perttu was not present to intercept every grievance, and the dearth of evidence that Corrections Officers at AMF assisted RUM Perttu in

refusing to submit Plaintiffs' grievances.  As such, Plaintiffs have not carried their burden of showing that administrative remedies were effectively unavailable to them.

## V.    Recommendation

The undersigned finds that RUM Perttu has proven by a preponderance of the evidence that Plaintiffs failed to exhaust their administrative remedies.  In addition, the undersigned finds that Plaintiffs have failed to prove that Perttu or any other MDOC official thwarted their efforts to file grievances against Perttu.  Accordingly, the undersigned respectfully recommends that the Court dismiss Plaintiffs' claims without prejudice.


Dated:     December 3, 2021                         /s/ *Maarten Vermaat*
                                                    MAARTEN VERMAAT
                                                    U. S. MAGISTRATE JUDGE


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).